```
 1  PHILLIP A. BAKER, BAR ID #169571
    pbaker@bknlawyers.com
 2  CHRISTOPHER K. MOSQUEDA, BAR ID #309622
    cmosqueda@bknlawyers.com
 3  BAKER, KEENER & NAHRA, LLP
    633 West 5th Street
 4  Suite 5500
    Los Angeles, California 90071
 5  Telephone: (213) 241-0900
    Facsimile: (213) 241-0990
 6
 7  Attorneys for Plaintiff,
    HRAYR SHAHINIAN, M.D., F.A.C.S.,
 8  Individually and on behalf of All Others
    Similarly Situated
 9
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| HRAYR SHAHINIAN, M.D., F.A.C.S., Individually and on behalf of All Others Similarly Situated, | Case No.: |
|---|---|
| Plaintiff, | **NATIONWIDE AND CALIFORNIA CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| STRYKER CORPORATION, a Michigan Corporation; and DOES 1 through 10, inclusive, | |
| Defendants. | |

Plaintiff HRAYR SHAHINIAN ("Plaintiff") brings this suit against Stryker Corporation ("Stryker to recover the damages owed to him and others similarly situated as a result of the Stryker's deceptive use of selling and marketing medical devices without proper FDA approval).

## PARTIES

1. Plaintiff HRAYR SHAHINIAN, M.D. ("Dr. Shahinian") is a physician residing and previously practicing medicine in the County of Los Angeles, State of California, within the Central District.

///

2. Defendant STRYKER CORPORATION (the "Stryker") is a Michigan corporation incorporated in the State of Michigan.

3. Plaintiff does not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as DOES 1 through 10, inclusive, under the provisions of Central District of California, Local Rule 19-1. Defendant DOES 1 through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiff. Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendants, together with appropriate charging allegations, when ascertained.

4. All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from the defendant, and seeks in the aggregate more than $5,000,000, exclusive of costs and interest.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) & (c) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because Defendants are subject to the Court's personal jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS

**A.   Background of Plaintiff.**

7. Dr. Shahinian is a skilled medical doctor, experienced skull base surgeon, and founder of SBI.

///

///

8. Dr. Shahinian completed his undergraduate studies at the American University of Beirut in 1981 and earned his M.D. in 1985. He earned both degrees with distinction and has been an active member of the honor medical society, Alpha Omega Alpha.

9. In 1986, Dr. Shahinian was accepted by Vanderbilt University Medical Center, where he completed an internship and residency in general surgery. Five years later, Dr. Shahinian went to New York University's Institute of Reconstructive Plastic Surgery, the premier craniofacial program in the nation. There, Dr. Shahinian completed a two-year fellowship in plastic and reconstructive surgery.

10. After successfully completing the fellowship at New York University, in 1993, Dr. Shahinian completed a fellowship in skull base surgery and neurotology in the Department of Head and Neck Surgery in Zurich, Switzerland under the tutelage of Professor Ugo Fisch, the preeminent skull base surgeon in the world at the time.

11. In 1994, Dr. Shahinian returned to New York University and completed a second fellowship in craniofacial surgery. He was certified by the American Board of Surgery in 1992, recertified in 2003 and 2014, and is a Fellow of the American College of Surgeons since 2002.

12. Since 1994, Dr. Shahinian has pioneered numerous new endoscopic surgical techniques to treat a variety of skull base disorders and is nationally and internationally recognized as one of the first surgeons in the world to use and pioneer endoscopic skull base surgery. Dr. Shahinian was Board Certified by the American Board of Surgery and was licensed to practice in California in 1996.

13. In 1996, Dr. Shahinian was recruited by Cedars-Sinai Medical Center to establish and head its Division of Skull Base Surgery and to direct its Skull Base Institute. Dr. Shahinian accepted the offer, relocated to California and was instrumental in establishing what has become one of the country's largest practices specializing in minimally-invasive endoscopic skull base and brain tumor surgery: The Skull Base Institute in Los Angeles.

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

14. Moreover, neurosurgeons from the across the United States as well as Barcelona, Marseilles, Brussels, Cairo, Kiev, Rome and Czech Republic have travelled to Dr. Shahinian for observation and training in Skull Base Surgery. Patients from around the world and most of the 50 states routinely travel to Los Angeles to be treated by Dr. Shahinian.

15. Dr. Shahinian has received numerous awards for his work in skull base surgery and has shared his experience and expertise in numerous journal articles, textbook chapters, and national as well as international presentations. For example, Dr. Shahinian authored the textbook, "Endoscopic Skull Base Surgery," which was originally published by Humana Press in 2009, followed by a Second Edition in 2011 and Chinese translation published that same year.

16. Dr. Shahinian holds a number of patents and has thrice received the National Aeronautics and Space Administration (NASA) Innovation Award in (2008, 2011 and 2012) for his work in the field of advanced medical technology.

17. In or around 2008, Dr. Shahinian started practicing skull base surgery exclusively at Thousand Oaks Surgical Hospital. In or around 2012, LRHMC purchased Thousand Oaks Surgical Hospital, and actively insisted that Dr. Shahinian transfer his practice and his entire team to the main campus of Los Robles Hospital. LRHMC induced and eventually recruited Dr. Shahinian to head a new division within its Department of Surgery: the Division of Skull Base Surgery (the "Program"). Pursuant to his agreement with LRHMC, Dr. Shahinian would also assist with the design, development, and promotion of a surgical program for treating skull base disorders—Dr. Shahinian's specialty.

18. From 2012 to 2016, Dr. Shahinian performed skull base surgery exclusively at LRHMC as an active member in good standing with the Staff.

///

///

///

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

B. **<u>Stryker sold to Plaintiff and others surgical instruments deceptively misleading as to whether these instruments were FDA approved - both the bipolar forceps and the so-called "hybrid bipolar forceps".</u>**

19. Over the last 23 years, Plaintiffs have purchased directly from Stryker multiple instruments including but not limited to the Bipolar Grasping Forceps. This includes both the bipolar forceps, item 92-12730, and bipolar forceps, item 92-12715.

20. As a result of this relationship, Plaintiffs engaged in business with multiple divisions of Stryker Corporation. Unfortunately, recently it has become clear that the Stryker bipolar grasping forceps instrument has never received 510k clearance by the Food and Drug Administration (FDA). This instrument required said approval. A thorough review of all Stryker filings show the bipolar grasping forceps never obtained 510k clearance.

21. Rather in 2010, Stryker received provisional approval as a Class II instrument. However there appears to have been no attempts to assure FDA approval. Further, attempts to merge the bipolar forceps with a different generator (a non-Stryker product due to the problems with the Stryker generator) likewise appears to have not been approved.

22. Upon review, it appears that Stryker misled Plaintiffs and other class members throughout this process – selling bipolar forceps which had not obtained 510k clearance as recently as 2016. Stryker craniomaxillofacial (CMF) directors of sales, marketing and R&D implemented a complex strategy involving Stryker employees to mislead Dr. Shahinian in efforts to capture his lucrative implant business. This organized and concerted effort included flying Dr. Shahinian to Freiburg, Germany and sending sales, marketing and R&D personnel from Ireland, Germany, Michigan and Arizona to meet with him routinely. Stryker misled Dr. Shahinian by selling the "hybrid bipolar forceps" at an uber premium and instructed employees to surreptitiously switch the hybrid bipolars with the finished bipolar grasping forceps product that were to be 510k cleared when delivered by Stryker, but this never took place. Stryker

intentionally mislead Dr. Shahinian with dozens of routine false product updates routed through numerous Stryker CMF personnel in an organized attempt to keep him utilizing Stryker implants.

23. In fact, Stryker has taken the position that the bipolar forceps never required 510k approval, insisting they were merely an "accessory" to a generator which did obtain approval. The bipolar forceps do not qualify as an accessory and were being used repeatedly in high risk skull base surgery. Stryker knew the uses and attempted to avoid 510k clearance by asserting that this device was merely an accessory to electrosurgical generator unit which although recalled, remained in large part on the market. Further, Stryker when recalling the electrosurgical device did not recall the bipolar forceps but rather attempted to use them on occasion with a separate generator not produced by Stryker. In short Stryker avoided 510k approval on the bipolar forceps by improperly asserting they were an accessory. They compounded that by not recalling the forceps when the generator unit was recalled. They further violated the law by allowing the forceps to be used with electrosurgical generator unit for which the bipolar forceps had never been approved as an accessory for over a decade.

24. However it got worse. Stryker began to develop a newer "hybrid bipolar grasping forceps". This dramatically changed the scope of the original product. It utilized new untested materials, insulation, electrosurgical output, assembly, disassembly and sterilization parameters. This unit was sold with no FDA review or testing completed as early as February of 2014. Recently, on August 18, 2017, Stryker took the position that the "hybrid bipolar forceps" only had a "modified grip requested by and sold exclusively to Dr. Shahinian" which "did not require any additional FDA clearance". This is false.

25. In March of 2015, Dr. Shahinian corresponded with Stryker via Hunter Cameron, Seth Brusseau, Tyson Stull and Lucas Kerr wherein he complained about the delays on the delivery of the newer custom bipolar grasping forceps. The purported reason for the delay was a "longer regulatory pathway (510k v. letter to file)".

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

1  Thereafter, in April of 2016, Gregg Diamond, Senior Director of Marketing, provided
2  Dr. Shahinian with a timeline regarding the "Bipolar Grasping Forceps". Contained in
3  the timeline is submission to the FDA and planned FDA approval for approximately
4  June of 2017. To date the so-called hybrid bipolar grasping forceps have never
5  obtained FDA 510K approval. The changes made to the hybrid bipolar grasping
6  forceps were known to Stryker to exceed the 807.81 threshold requiring FDA review.
7  Stryker intentionally deceived Plaintiffs as recently as August 18, 2017. Stryker CMF
8  sales leadership personnel Seth Brusseau and Tyson Stull were released from their
9  employment due to ethical violations conducted at Stryker in August, 2017.
10     26.    Recently, Stryker provided materials to the hospital for which Dr.
11 Shahinian intends to seek privileges wherein Stryker, via James Pell and Sven Kunz,
12 forwarded a document which notes that the bipolar forceps are a Class 1 instrument and
13 exempt from 510k compliance. This is false and the documents previously provided to
14 Dr. Shahinian demonstrate Stryker's a) knowledge that FDA compliance was necessary
15 and b) the lack of compliance on the bipolar forceps previously sold and utilized by Dr.
16 Shahinian during approximately 7400 surgeries in the past and c) Stryker corporate
17 officers knowingly instructed sales, marketing and R&D personnel to collude together
18 to mislead Dr. Shahinian as to the truth of the 510k clearance with the focus being to
19 capture significant sales from Dr. Shahinian's utilization of other Stryker implant
20 products.
21     27.    As such, Stryker has also obtained an unfair and illegal windfall by virtue
22 of said practice.

C.  **Stryker has a pattern and practice of misleading consumers.**

     28.    Stryker CMF Western Area Director Seth Brusseau and Desert Regional
Manager Tyson Stull ran numerous unethical and highly complex schemes to drive
sales in the competitive medical sales market. Tyson Stull stated to numerous
employees in April 2013 that he was manipulating FDA Approved implants used by Dr.
Stringer at Loma Linda Medical Center in bilateral sagittal split osteotomy orthognathic

cases by taking the implants to his father's machine shop and beveling out the back of the titanium plates. Drew Shallahammer and Brad Boyle would then take the post manufactured manipulated plates and put them into Dr. Stringers personal plating system for sterilization and implantation. Tyson did this because Stryker initially denied the request to make this line extension at the time and was desperate to keep up with competitor Osteomed, who had manufactured this for Dr. Stringer.

29. Further, Seth Brusseau and Tyson Stull ran a complex poaching scheme against the market leader, Johnson & Johnson. Seth Brusseau, John Hilvert, Kevin Tommassini and Tyson Stull, all regional directors poached numerous sales representatives including Paul Reitmeier, Ryan Edwards and Spencer Bringhurst with each flipping millions in business to Stryker. Seth and his regional managers utilized fake and personal non-Stryker email accounts to pass back door information regarding Johnson & Johnson pricing, intellectual property and internal marketing material. On August 5th, 2016 Paul Reitmeier sent hundreds of pages of internal Johnson & Johnson Synthes internal documents and sales reports to Stryker sales representatives. These emails were titled "funny" and "funny 2". Paul Reitmeier was hired and paid $300,000 to sit on the sidelines and surreptitiously violate his yearlong non-compete by instructing Stryker sales representatives Drew Shallahammer, Jason Saenz, Brad Boyle and Lucas Kerr. Even further Paul Reitmeier went to numerous surgeon's offices in complete violation under Stryker management's direction and took Oral Surgeon Dr. Ratner to lavish entertainment venues to discuss flipping from J&J to Stryker implant business.

## CLASS ACTION ALLEGATIONS

30. Plaintiff brings this action on his own behalf, and as a class action on behalf of the Classes defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3). The Classes consist of thousands of purchasers victimized by Defendants' unfair and illegal practices. Specifically, Plaintiff brings this suit on behalf of the following Classes:

**The "Nationwide Class"**: All persons who are or were purchasers of non-FDA approved products by Stryker within the United States. The class excludes counsel representing the class and all persons employed by said counsel and/or who purchased products sold by Stryker on behalf of counsel, governmental entities, Stryker, any entity in which the Stryker has a controlling interest, Stryker's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

**The "California Subclass"**: All persons who are or were purchasers of non-FDA approved products from Stryker within the State of California. The subclass excludes counsel representing the subclass and all persons employed by said counsel and/or who purchased non-FDA approved products from Stryker on behalf of counsel, governmental entities, Stryker, any entity in which the Stryker has a controlling interest, Stryker's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

31.   Stryker subjected Plaintiff and each of the respective Classes to the same wrongdoing and harmed them in the same manner.  Now, Plaintiff and each of the respective Classes seek to enforce the same rights and remedies pursuant to the same legal theories: breach of contract, fraud and unfair business practices.

///

///

32. <u>Numerosity</u>: The proposed classes are so numerous that individual joinder of all their members is impracticable. While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery. The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

33. <u>Typicality</u>: Plaintiff's claims are typical of the claims of his respective Classes in that his claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and is based on the same legal theory as their claims.

34. <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Classes. Undersigned counsel has substantial experience in prosecuting complex lawsuits and class action litigation. Plaintiff and undersigned counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests adverse to the Classes.

35. <u>Superiority of Class Action and Impracticability of Individual Actions</u>: Plaintiff and the members of the Classes suffered harm as a result of Stryker's unlawful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of all members of the Classes is impractical. Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by the Stryker defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class Members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the

rights of the Class Members. Adjudication of individual Class Members' claims with respect to Defendants would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class Members to protect their interests.

36. <u>Common Questions of Law and Fact Predominate</u>: In addition, the requirements of Federal Rule of Civil Procedure 23 are satisfied by questions of law and fact common to the claims of Plaintiff and of each member of the Classes and which predominate over any question of law or fact affecting only individual members of the Classes. Common questions of law and fact include, but are not limited to, the following:

   a. The questions of law and fact common to the Nationwide Class include the following: (i) were members of the Nationwide Class entitled to be sold non-FDA approved products?; (ii) were the members of the Nationwide Class sold products which were non-FDA approved?; (iii) did such sales constitute a breach of contract under the applicable Law?; (iv) did defendants' practices constitute fraud?; (v) are members of the Nationwide Class entitled to damages?

   b. The questions of law and fact common to the California Subclass include the following: (i) were members of the Nationwide Class entitled to be sold non-FDA approved products?; (ii) were the members of the Nationwide Class sold products which were non-FDA approved?; (iii) did such overcharges constitute a breach of contract under the applicable contract?; (iv) did defendants' practices constitute fraud?; (v) did defendants' practices constitute unfair business practices?; (vi) are members of the California Subclass entitled to damages?

37. <u>Notice</u>: Notice can be provided via internet publication, published notice and/or through the mail and paid for by Stryker.

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

# FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

### (By all Plaintiffs Against Stryker and DOES 1-10)

38. The allegations of paragraphs 1 through 33 are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a cause of action on behalf of himself and the classes of similarly situated lessees.

39. Stryker entered into contracts with Plaintiffs for the purchase of FDA approved products.

40. Plaintiffs fully and properly performed all conditions, covenants, and acts required to be performed on their part in accordance with the terms and conditions of the contract including payment for the products.

41. Defendants breached their obligations under the agreement to the "Nationwide Class" and "California Subclass" by marketing and selling products which were not approved by the FDA.

42. As a direct and proximate result of Stryker's breaches, Plaintiffs have sustained damages including, but not limited to the costs of the purchase of the unsafe and non-approved products.

43. Defendants acted in bad faith and acted vexatiously, wantonly, obdurately, and oppressively in connection with the sales of non-FDA approved products. Stryker knew or should have known that they needed to obtain FDA approval for products sold including those products which would be used inside the skull. In addition, Defendants knowingly and intentionally failed to timely inform class members that the products sold and used by physicians were not FDA approved.

44. On information and belief, by failing to inform class members of this risk, Stryker purposely ensured they received significant profits from the sale of non-FDA approved products. Had Stryker notified class members about the lack of approval, class members could have mitigated their damages. Instead, Defendants chose to proceed under the façade of normality, billing Plaintiffs for products which were not

approved.

46. All conditions proceeding to Plaintiffs' claims for relief have been performed or have occurred.

46. Plaintiffs seek to recover actual damages outlined below from the Defendants as a direct and proximate result of the unlawful conduct of the Stryker.

47. Plaintiffs will show that Stryker acted in bad faith, vexatiously, wantonly, obdurately, and/or oppressively and will therefore seek to recover attorneys' fees.

## SECOND CLAIM FOR RELIEF
## FRAUD (AFFIRMATIVE MISREPRESENTATIONS)
### (By all Plaintiffs Against Stryker and DOES 1-10)

48. Plaintiffs restate and re-allege paragraphs 1 through 44 as if fully set forth herein.

49. Defendants uniformly represented that Plaintiffs' purchase of equipment for high-risk surgeries had been vetted and approved for by the Food and Drug Administration. Knowing however that it was not approved, Stryker sought to mislead physicians about the status of said approval. Further, Stryker engaged in a plan and scheme to redesign equipment without obtaining FDA approval at all and sold said equipment to Plaintiffs.

50. Each of Defendants' representations described above were false. Defendants intentionally and/or recklessly misrepresented the material facts set forth above. The true facts include, among other things, that Stryker sold products which required FDA approval without said approval. Further, Stryker made significant revisions to products including the so-called hybrid bipolar forceps without obtaining FDA approval before these were sold.

51. Defendants' statements were made with the intent to deceive Plaintiffs and the Class, and to induce Plaintiffs and the Class to purchase products under the guise they were approved by the FDA.

52. Plaintiffs and the Class, at the time these representations were made by Defendants, and at the time Plaintiffs and the Class took the actions herein alleged, were ignorant of the falsity of Defendants' representations and believed them to be true. Plaintiffs and the Class relied on Defendants' representations and had Plaintiffs and the Class known of the actual facts, Plaintiffs and the Class would not have taken the actions they did, including but not limited to purchasing non-FDA approved products, purchasing other products from Stryker, and utilizing said medical devices on patients. Plaintiffs and the Class' reliance on Defendants' representations was justified.

53. As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

54. Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, oppression, and/or malice. This despicable conduct subjected Plaintiffs and the Class to cruel and unjust hardship so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future. Therefore, Plaintiffs and the Class are also entitled to punitive damages against Defendants in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### FRAUDULENT CONCEALMENT/NON-DISCLOSURE
**(By all Plaintiffs Against Stryker and DOES 1-10)**

55. Plaintiffs restate and re-allege paragraphs 1 through 51 as if fully set forth herein.

56. As alleged above, Defendants made a number of representations concerning the approval of the aforementioned products to Plaintiff including that they were approved by the FDA.

///

///

- 14 -

57.     Defendants' representations described above were false.  However, despite knowing of the falsity of their representations, Defendants concealed, and/or failed to disclose material and contrary facts set forth above, including, among other things, that the bipolar forceps and the so-called hybrid bipolar forceps were not FDA approved.

58.     Defendants had a duty to disclose this information to the Plaintiffs because: (a) it is material information that causes financial injury to Plaintiffs, and Defendants knew the information was not reasonably discoverable by the Plaintiffs; (b) Defendants made affirmative representations that were contrary and misleading without the disclosure of this information; and/or (c) Defendants actively concealed this information from the Plaintiffs, third parties, tax authorities and the public, including those patients who underwent procedures with non-FDA approved products.

59.     Defendants concealed and failed to disclose these material facts with the intent to deceive Plaintiffs and the Class, including but not limited to concealing the lack of approval by the FDA of Stryker's products.

60.     Defendants' concealments and non-disclosure of material facts as set forth above were made with the intent to induce Plaintiffs and the Class to purchase non-approved products.

61.     Plaintiffs and the Class, at the time these failures to disclose and suppressions of facts occurred, and at the time Plaintiffs and the Class purchased Stryker products, were ignorant of the existence of the facts that Defendants suppressed and failed to disclose.  If Plaintiffs and the Class had known of Defendants' concealments and failures to disclose material facts, they would not have taken the actions they did, including not purchasing non-approved products, purchasing other Stryker products and using said products on high risk procedures.   Plaintiffs and the Class' reliance was justified and reasonable as they had no basis to doubt the original representations made to them, nor did they have reason to believe they were being misled or material facts were being concealed from them.

///

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

62. As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

63. Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, oppression, and/or malice.  This despicable conduct subjected Plaintiffs and the Class to cruel and unjust hardship so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.  Therefore, Plaintiffs and the Class are also entitled to punitive damages against Stryker in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 *ET SEQ.***

**(On Behalf of the California Subclass Only)**

64. Plaintiffs restate and re-allege paragraphs 1 through 59 as if fully set forth herein.

65. California Business and Professions Code section 17200 et seq., also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent, or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

66. By engaging in the false, deceptive, and misleading conduct alleged above, Defendants have engaged in unlawful business acts and practices in violation of the UCL, including by violating state and federal laws, including but not limited to 21 U.S.C. § 360, and 21 C.F.R. §§ 803.1 et seq., 21 C.F.R. § 878.4040, and Cal. Bus. & Prof. Code §§ 17500 et seq.

67. Defendants' conduct in misleading the California Plaintiffs and the California Subclasses through their affirmative misrepresentations and failures to disclose material facts to the aforementioned plaintiffs and the California Subclasses, as

- 16 -

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

described above, also constitutes a "fraudulent" and "unfair" business practice within the meaning of the UCL.

68. The California Plaintiffs and each California Subclass Member suffered an injury in fact and lost money or property as a result of Defendants' unlawful, unfair, and/or fraudulent business practices.

69. The California Plaintiffs, on behalf of themselves and the California Subclasses, seek restitution and disgorgement of all moneys received by Defendants through the unlawful, fraudulent and unfair conduct described above.

70. The California Plaintiffs, on behalf of themselves and the California Subclasses, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to selling non-FDA approved products in the county where each Plaintiff resides.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

71. Plaintiffs seek to recover the following damages and obtain the following relief from Defendants:

## **ON THE FIRST CAUSE OF ACTION FOR FRAUD**
## **(BREACH OF CONTRACT)**

1. An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.
2. Economic loss and damages suffered by Plaintiffs.
3. For attorneys' fees incurred herein, to the extent permitted by law.
4. Court costs.
5. For pre and post judgment interest and costs of suit incurred herein.
6. For such other relief to which Plaintiffs may show themselves justly entitled.

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

## ON THE SECOND CAUSE OF ACTION FOR FRAUD
## (AFFIRMATIVE MISREPRESENTATIONS)

1. An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.
2. An injunction precluding the wrongful conduct described herein.
3. For compensatory damages in an amount that exceeds $500 million, with the exact amount to be proven at trial.
4. For punitive damages in an amount sufficient to punish Defendants and to deter them from engaging in wrongful conduct in the future.
5. For pre and post judgment interest and costs of suit incurred herein.
6. For attorneys' fees incurred herein, to the extent permitted by law.
7. For such other and further relief as the Court may deem just and proper.

## ON THE THIRD CAUSE OF ACTION
## FOR FRAUDULENT CONCEALMENT

1. An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.
2. An injunction precluding the wrongful conduct described herein.
3. For compensatory damages in an amount that exceeds $500 million, with the exact amount to be proven at trial.
4. For punitive damages in an amount sufficient to punish Defendants and to deter them from engaging in wrongful conduct in the future.
5. For pre and post judgment interest and costs of suit incurred herein.
6. For attorneys' fees incurred herein, to the extent permitted by law.
7. For such other and further relief as the Court may deem just and proper.

///
///
///

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

**ON THE FOURTH CAUSE OF ACTION FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)**

1. An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.
2. An injunction precluding the wrongful conduct described herein.
3. For restitution of moneys paid for property in an amount that exceeds $500 million, with the exact amount to be proven at trial.
4. An award of equitable and declaratory relief.
5. For pre and post judgment interest and costs of suit incurred herein.
6. For attorneys' fees incurred herein, to the extent permitted by law.
7. For such other and further relief as the Court may deem just and proper.

DATED: June 14, 2018         BAKER, KEENER & NAHRA, LLP

By */s/ PHILLIP A. BAKER*
PHILLIP A. BAKER
CHRISTOPHER K. MOSQUEDA
Attorneys for Plaintiff,
HRAYR SHAHINIAN, M.D., F.A.C.S.,
Individually and on behalf of All Others
Similarly Situated

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: June 14, 2018         BAKER, KEENER & NAHRA, LLP

By */s/ PHILLIP A. BAKER*
PHILLIP A. BAKER
CHRISTOPHER K. MOSQUEDA
Attorneys for Plaintiff,
HRAYR SHAHINIAN, M.D., F.A.C.S.,
Individually and on behalf of All Others
Similarly Situated

**NATIONWIDE & CALIFORNIA CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**